# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| GERARDO CAMPOS, | : | |
| YADIRA D. VEGUILLA ROSARIO, | : | |
| and the conjugal Partnership constituted | : | |
| between them, | : | |
| and CAMILA A. CAMPOS VEGUILLA | : | |
| | : | |
| Plaintiffs | : | CASE NO. 3:12-cv-01529-ADC |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| SAFETY-KLEEN SYSTEMS, INC., | : | |
| A Delaware corporation; DEFENDANT DOES | : | |
| (1-100); MAKITA USA, INC., NATIONAL | : | |
| RENTAL AND SALES, INC., and | : | |
| TOOL BOX, INC. | : | |
| | : | |
| Defendants | : | |

## AMENDED COMPLAINT

**TO THE HONORABLE COURT:**

COME NOW the Plaintiffs, Gerardo Campos, Yadira D. Veguilla Rosario, and Camila A. Campos Veguilla, through the undersigned attorney, and very respectfully alleges and prays as follows:

## I.        BRIEF INTRODUCTION

1.  This is an action to recover damages, personal injuries, restitution, refunds, injunctive and declaratory relief against Safety-Kleen Systems, Inc., Makita USA, Inc., National Rental and Sales, Inc., and Tool Box, Inc.. Plaintiff, Gerardo Campos, used Safety Kleen parts washers between 1993 and 2010 during his training and employment at Makita USA, Inc., National Rental and Sales, Inc. and Tool Box, Inc.  During that time (1993-2010), Plaintiff, Gerardo Campos was exposed to Safety-Kleen Solvent 105 while working with the Safety Kleen parts

washers at Makita USA, Inc., National Rental and Sales, Inc. and Tool Box Inc. and subsequently developed chronic myelogenous leukemia as a direct result from his exposure to Safety-Kleen Solvent 105 and the toxic chemicals contained therein.  Plaintiff, Gerardo Campos, was diagnosed with chronic myelogenous leukemia on November 11, 2011.

## II.    JURISDICTION

2.  This Honorable Court has jurisdiction pursuant to 28 U.S.C.A. sec. 1332 (a) for claims under Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. sec 3141 et seq. given that Plaintiffs at all times relevant to this Complaint were and still are residents of the Commonwealth of Puerto Rico and Defendant companies Safety-Kleen Systems, Inc. and Makita USA, Inc. are companies organized and doing business outside of the Commonwealth of Puerto Rico and the amount in controversy exceeds seventy five thousand dollars ($75,000.00).

## III.    VENUE

3.  The proper venue to bring this action is the United States District Court for the District of Puerto Rico since the events that give rise to this action occurred within the District of Puerto Rico, 28 U.S.C.A. 1391 (A)(2) and the Defendant Safety Kleen Systems Inc. is a Delaware corporation headquartered in Plano, Texas and with a principal place of business at Plano, Texas at 5360 Legacy Drive, Building 2, Plano, Texas, 75024.   Safety Kleen Systems Inc. manufactures and distributes Safety Kleen Solvent 105 in the District of Puerto Rico. Makita USA, Inc. is a California corporation headquartered in La Mirada, California with a principal place of business at at 14930 Northam Street, La Mirada, CA 90638.  National Rental and Sales, Inc. is a tool rental company incorporated in Puerto Rico with a principal place of business at Cruz Stella Ave. 114 Humacao PR, 00791.  Tool Box, Inc. is a tool rental company and/or

hardware store incorporated in Puerto Rico with a principal place of business at El Verde Condominium Apt. 303 Costa Rica Street 185 San Juan, PR 00917.

## IV.    PARTIES

### Plaintiffs

4.   Plaintiffs Gerardo Campos and Yadira D. Veguilla Rosario are of legal age, married with each other and residents of San Juan, Puerto Rico.  Their conjugal partnership is also included as a plaintiff in this case.   Plaintiff Gerardo Camps was born on May 28, 1967.  At all material times hereto, Plaintiff, Gerardo Campos, and Yadira D. Veguilla Rosario, were married and residing in Puerto Rico.

5.   Plaintiff, Camila A. Campos Veguilla, is the minor child of Plaintiffs, Gerardo Campos and Yadira D. Veguilla Rosario, and her legal capacity is supplemented by her parents.

### Defendants

6.   Plaintiffs are informed and believe and thereon allege that the Defendant, Safety-Kleen Systems, Inc., is a Delaware corporation, which at all material times hereto, has been doing business in Puerto Rico.

7.   Defendants Does 1-100 supplied mineral spirits to Safety-Kleen in Puerto Rico, which Safety-Kleen incorporated into its recycled solvent pool, such that the Plaintiff was exposed to these defendants' petroleum products as well as Safety-Kleen solvents.  These defendants are sometimes referred to hereinafter as the "Supplier Defendants" to distinguish them from Safety-Kleen.

8.   The true names and capacities of Defendants Does 1 through 100 are unknown to plaintiffs, who therefore sues said defendants by such fictitious names.  Plaintiffs will amend this complaint to state the true names and capacities of said fictitious defendants when they have

been ascertained.  Plaintiffs are informed and believe and thereon alleges that Defendants Does 1 through 100 are in some manner responsible for the occurrences herein alleged, and that plaintiffs' damages as herein alleged were proximately caused by their conduct.

9.  Plaintiffs are informed and believe and based thereon allege that, at all times material hereto, each of the Defendants, including fictitiously named Defendants, was acting in an individual, corporate, partnership, associated, parent-subsidiary, successor-predecessor, conspiratorial or other capacity or as the agent, employee, co-conspirator, and/or alter ego of its co-defendants, and in doing so the acts herein alleged, was acting within the course and scope of its authority as such parent, successor, partner, associate, agent, employee, co-conspirator, or alter ego, and with the permission, consent, knowledge, authorization, ratification and direction of its co-defendants, including all fictitiously name defendants.

10. Plaintiffs allege that Makita USA, Inc., National Rental & Sales, Inc. and Tool Box, Inc. (hereinafter the "employer defendants") failed to adequately warn the Plaintiff, Gerardo Campos, of the harmful nature of the Safety Kleen Solvent 105, failed to adequately provide proper training on how to use the Safety Kleen Solvent 105, and/or failed to provide the adequate protective gear to be used by Plaintiff, Gerardo Campos, during the time he worked with the solvent.

## V.    FACTS

11. From about 1993 through 2010, Plaintiff Gerardo Campos, trained and worked using parts washers for Makita USA, Inc., National Rental and Sales, Inc. and Tool Box, Inc.

12. During his employment with Makita USA, Inc., National Rental and Sales, Inc. and Tool Box, Inc. Plaintiff Gerardo Campos was exposed to Safety-Kleen Solvent 105.  Plaintiffs are

informed and believe and thereon allege that the injuries Plaintiff Gerardo Campos, suffers from were sustained in the course of the work for said companies.

13. In the course of and throughout Plaintiff's employment with various companies including Makita USA, Inc., National Rental and Sales, Inc. and Tool Box, Inc., Plaintiff Gerardo Campos worked with Safety-Kleen parts washer machines and was exposed to Safety-Kleen solvents, including Safety Kleen Solvent 105, from those machines.

14. Defendant, Safety-Kleen is the world's largest recycler of automotive and industrial fluid wastes.  Safety-Kleen offers a Parts Washer Service, Fluid Recovery Service, Oil Recovery Service, Paint Refinishing Service, Dry Cleaning Service, and Imaging Service.

15. The Parts Washer Service is the largest part of Safety-Kleen's business.  Safety-Kleen provides customers a parts washer machine, which it periodically fills with solvent removing the used ("dirty") solvent, which it recycles for reuse.  Safety-Kleen provides tow basic types of parts washers and solvents to its customers: a mineral-spirits based solvent for degreasing parts, and an immersion cleaner for parts which require special cleaning.

16. The Safety-Kleen parts washer machines are all essentially a "sink-on-a-drum."  The machines consist of a tank partially filled with Safety-Kleen 105 Solvent, a pump to pump solvent through a hose with a brush attached to it, and a sink in which the operator scrubs parts to degrease and clean them with the recycled solvent.

17. Unlike most petroleum products, Safety-Kleen 105 is not a refined petrochemical product but is rather hazardous waste; it is a recycled petroleum product that is contaminated with multiple carcinogens and other toxic chemicals not ordinarily found in refined petroleum solvents.

18. The primary constituent of Safety-Kleen 105 Solvent is mineral spirits, which is a complex mixture of aromatic and aliphatic hydrocarbons obtained from the distillation of crude oil. To this Safety-Kleen adds an antistatic agent and a green dye. The product is called "105 Solvent" because its flashpoint is supposedly 105 degrees Fahrenheit, which would render it a combustible rather than a flammable material under various regulations.

19. Safety-Kleen 105 Solvent is contaminated with multiple carcinogenic chemicals, including benzene, perchloroethylene, trichloroethylene, methylene chloride, chlorinated benzenes, and polycyclic aromatic hydrocarbons.

20. Benzene is a human carcinogen that causes leukemia and other cancers at concentrations as low as 1 part per million (ppm).

21. Benzene occurs naturally in crude oil and is therefore found in mineral spirits in varying amounts depending on the quality of the distillation process. Benzene has been detected in the virgin mineral spirits that Safety-Kleen purchases at concentrations from "nil" up to several hundred parts per million.

22. Benzene is also introduced into recycled Safety-Kleen 105 Solvent by Safety-Kleen's automotive customers. For years, benzene has also been used as an antiknock agent additive in gasoline. When automotive shops clean carburetors and other automobile parts using Safety-Kleen 105 Solvent, benzene is introduced into the used solvent, which is then recycled and delivered anew to customers.

23. The concentration of benzene in Safety-Kleen 105 Solvent varied widely by vendor, load, recycling facility, year, etc. Indeed, Safety-Kleen found benzene in the virgin mineral spirits it purchased at levels of several hundred ppm and recorded a benzene concentration in the spent solvent as high as 1380 ppm. According to a memorandum dated February 12, 1990

prepared by James Breece, Vice President of Technical, the benzene content varied significantly throughout the Safety-Kleen system, but was generally in the range of 2 to 70 ppm as of that date.  However, in the same memo, Mr, Breece wrote that the "highest concentrations were found in recycled solvent from the Reedley Recycle Center."  It was this facility that recycled all the solvent used in California.

24. Safety-Kleen collects used Safety-Kleen 105 Solvent from its Puerto Rico customers and supplies them with recycled solvent.  The used solvent is transported to the local service center, where it is put in a storage tank with used solvent from other customers.  The solvent is then pumped into a tanker truck and shipped to Safety-Kleen's recycle center.

25. At the recycle center, the used solvent is pumped into a settling tank, where water, dirt, and heavy oils settle to the bottom of the tank and are removed.  The rest of the material is pumped into a crude evaporator.  As the evaporator is heated in a vacuum, volatile chemicals evaporate, rise, and go into a condensation unit where they cool and re-condense.  The first components to evaporate are low-boiling aromatics, including benzene.  When benzene recondenses on the other side of the column, it could be extracted from the solvent by various means, but Safety-Kleen does not extract benzene or any of the other toxic contaminants of the product.  Safety-Kleen just continues heating the liquid in the evaporator until all the volatile components evaporate and recondense.  The recondensed material, which is called recycled solvent (and improperly called "clean" solvent) is then delivered to customers.

26. The process continues on and on in what has been called a "closed-loop" system. However, not all of the solvent or its carcinogenic contaminants remains in the "closed-loop" system."  Unfortunately, large amounts of the solvent and its carcinogenic components is inhaled

into the lungs of operators of the parts washer machines and is absorbed through their skin into their bloodstream.

27. As a result of the ordinary use of the Safety-Kleen parts washer machine, workers inhale toxic vapors from Safety-Kleen 105 solvent aerosols which form as the solvent flows through the hose into the air in an open system, and from vapors which form as volatile components evaporate into the air.  Also as a result of the ordinary and intended use of the machine, solvent splashes onto the skin of workers operating the machine.  The parts washer machines are commonly used in industry, often in conjunction with an air hose, which blow-dries parts which have been degreased in the machine.  It also has been a customary practice in industry for workers to wash their hands using the parts washer machine.

28. In the course of his work for various companies, including Makita, National Rental and Tool Box, Plaintiff Gerardo Campos was exposed to toxicologically significant levels of these chemicals.

29. Plaintiff Gerardo Campos was never warned of the toxic nature of the Safety Kleen Solvent 105 that he was working with.

30. Plaintiff Gerardo Campos did not receive warnings of the toxic nature of Safety Kleen Solven 105 from Safety Kleen, or any of his employers at Makita USA, Inc., National Rental and Sales, Inc., and Tool Box, Inc..

31. As a direct and proximate result of said exposure to said toxic chemical products, Plaintiff Gerardo Campos sustained serious injuries, including chronic myelogenous leukemia.

32. Plaintiff Gerardo Campos was diagnosed with chronic myelogenous leukemia on November 11, 2011.

33. As a result of the exposure to Safety Kleen Solvent 105, Plaintiff, Gerardo Campos, has been diagnosed with chronic myelogenous leukemia, and has had to undergo medical care and treatment including chemotherapy, among other treatments.

34. As a direct result of the exposure to Safety Kleen Solvent 105, Plaintiff Gerardo Campos, has incurred medical expenses which exceed $6,400.00 a month.

## VI.     FIRST CAUSE OF ACTION
NEGLIGENCE
(By All Plaintiffs Against
All Named Defendants and Does 1-100

35. Plaintiffs refer to paragraphs 1 through 34 and, by this reference, incorporate said paragraphs here as though set forth in full.

36. As chemical manufacturers and distributors, Defendants owed Plaintiff a legal duty to exercise due care in importing, producing, and distributing the foregoing chemical products to various companies including Makita, National Rental and Tool Box.

37. Defendants negligently and carelessly imported, produced, and distributed the foregoing chemical products to various companies including Makita, National Rental, and Tool Box where Plaintiff, Gerardo Campos, was exposed to said toxic chemical products.

38. Defendants also failed to adequately warn Plaintiff, Gerardo Campos, of the hazards of said toxic chemical products and failed to provide adequate instructions to Plaintiff, Gerardo Campos, for the safe handling and use of said toxic chemical products.

39. Plaintiff, Gerardo Campos, was exposed to each of the foregoing toxic chemical products.

40. Each of the toxic chemical products to which Plaintiff, Gerardo Campos was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

41. As a result of Plaintiff, Gerardo Campos exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene, entered Plaintiff, Gerardo Campos', body.

42. Plaintiff, Gerardo Campos, suffered from a specific illness, to wit, chronic myelogenous leukemia, as well as other related and consequential injuries.

43. Each of the foregoing toxic chemical products caused Plaintiff, Gerardo Campos', chronic myelogenous leukemia and other injuries.

44. Each toxin that entered Plaintiff, Gerardo Campos' body was a substantial factor in bringing about, prolonging, and aggravating his chronic myelogenous leukemia and other injuries.

45. As a direct and proximate result of said negligent acts and omissions of Defendants, Plaintiffs suffered losses and damages for medical and related expenses for Plaintiff, Gerardo Campos' medical care, lost earnings, lost wages, loss of future earning capacity, and damages for pain, suffering and disfigurement.

46. As a direct and proximate result of said negligent acts and omissions of said Defendants, Plaintiffs Camila Campos Veguilla and Yadira D. Veguilla Rosario, have suffered loss of financial benefits, services, advice and training, love, comfort, companionship, society, affection, solace, and moral support.

47. As a direct and proximate result of said negligent acts and omissions of Defendants, Plaintiff, Yadira D. Veguilla Rosario, has suffered loss and deprivation of the services, love, companionship, comfort, affection, society, solace, and moral support of her husband, and enjoyment of sexual relations with him, from the time he became incapacitated.

## VII.   SECOND CAUSE OF ACTION
FOR STRICT LIABILITY - WARNING DEFECT
(By All Plaintiffs Against
All Named Defendants and Does 1 – 100)

48. Plaintiffs refer to paragraphs 1 through 47 and, by this reference, incorporate said paragraphs heart as though set forth in full.

49. At all times mentioned herein, defendants were the importers, producers, and distributors of chemical products which were delivered to or used at various facilities in Puerto Rico, including Makita, National Rental and Tool Box, where Plaintiff, Gerardo Campos, was exposed to them.

50. The chemical products which Defendants imported, produced, and distributed to various companies including Makita, National Rental and Tool Box, were defective, because they lacked warnings adequate to apprise Plaintiff, Gerardo Campos, of their toxic hazards and their serious effects upon the human body and they lacked instructions for handling and use adequate to prevent exposures to Plaintiff, Gerardo Campos, serious injuries and diseases.

51. Plaintiff, Gerardo Campos, was exposed to each of the foregoing toxic chemical products.

52. Each of the toxic chemical products to which Plaintiff, Gerardo Campos, was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

53. As a result of the Plaintiff, Gerardo Campos, exposure to the foregoing toxic chemical products, toxins within said chemical products, including benzene, entered Plaintiff, Gerardo Campos', body.

54. Plaintiff, Gerardo Campos, suffered from a specific illness, to wit, chronic myelogenous leukemia, as well as other related and consequential injuries.

55. Each of the foregoing toxic chemical products caused Plaintiff, Gerardo Campos', chronic myelogenous leukemia and other injuries.

56. Each toxin that entered Plaintiff, Gerardo Campos', body was a substantial factor in bringing about, prolonging, and aggravating his chronic myelogenous leukemia and other injuries.

57. As a direct and proximate result of the defective warnings of Defendants' chemical products, Plaintiff, Gerardo Campos, suffered from chronic myelogenous leukemia and other related and consequential medical conditions.

58. As a direct and proximate result of said defective warnings of Defendants' chemical products, Plaintiffs Yadira D. Veguilla Rosario and Camila A. Campos Veguilla, have suffered losses and damages for medical and related expenses for Plaintiff, Gerardo Campos', medical care, lost earnings, for lost wages, loss of future earning capacity, and other than damages for pain, suffering and disfigurement.

59. As a direct and proximate result of said defective warnings of Defendants' chemical products, Plaintiffs, Yadira D. Veguilla Rosario and Camila A. Campos Veguilla, have suffered loss of the value of benefits they would have received from Plaintiff, Gerardo Campos, including support and other financial benefits, services, advice and training, love, comfort, companionship, society, affection, solace, and moral support.

60. As a direct and proximate result of said defective warnings of Defendants' products, Plaintiff, Yadira D. Veguilla Rosario, has suffered loss and deprivation of the services, love, companionship, comfort, affection, society, solace, and moral support of her husband, and enjoyment of sexual relations with Plaintiff, Gerardo Campos.

61. In exposing Plaintiff to said toxic chemicals, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiff's safety despite knowledge of the probable dangerous consequences of their chemicals, and willfully and deliberately failed to avoid said dangerous consequences befalling, Plaintiff, Gerardo Campos.  Defendants were either aware of, or culpably indifferent to, unnecessary risks of injury to Plaintiff, Gerardo Campos.  Defendants concealed known toxic hazards to their chemicals from Plaintiff, Gerardo Campos, specifically failing to warn him of adverse toxic effects of their chemicals, and such hazards were known by and such concealment was ratified by the corporate officers and managers of each of the defendants.

62. Defendants consciously decided to market their chemical products with knowledge of their harmful effects and without remedying the toxic effects of their chemicals, and such marketing despite knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants.  Defendants also misrepresented the nature of their chemical products, by withholding information from their products during their anticipated or reasonably foreseeable users, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the defendants.

63. In the early 1990s, Paul Dittmar, Safety-kleen's Product and Process Development Manager was assigned with the task of determining the extent of the solvent contamination problem and identifying remedial technologies.  In a memo addressed to the company's general counsel, Mr. Dittmar concluded that the solvent contamination problem was a major problem. He determined that a number of different technologies existed to resolve the problem, but that

the best and simplest technology was fractional distillation – technology which has been used to refine crude oil since the turn of the century.

64. Mr. Dittmar determined that the use of such technology would totally eliminate benzene from the recycled product and reduce the chlorinated content of the solvent by 90%. Mr. Dittmar, who is not only a chemist, but also holds a Masters Degree in Business Administration, then proceeded to determine the cost of implementing fractional distillation technology at Safety-Kleen's domestic recycling centers. He determined that the cost of installation of the fractional distillation equipment would only be about $1 million for each of the company's half-dozen recycling facilities and that the additional cost of processing the solvent would only be about 2 to 4 cents per gallon.

65. Although Safety-Kleen was aware that its recycling process was defective and that it could be easily remedied for a capital expenditure of $1 million for each of its half-dozen recycling facilities (about ½ of one percent of its annual gross revenues) and a cost of about 3 cents per gallon (which could easily have been passed on to its customers), Safety-Kleen did not install fractional distillation equipment at its recycle centers.

66. Defendants' conduct in exposing Plaintiff to said toxic chemicals without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiffs, entitling Plaintiffs to punitive and exemplary damages.

## VIII.   THIRD CAUSE OF ACTION
FOR STRICT LIABILITY – DESIGN DEFECT
(By All Plaintiffs Against
All Named Defendants and Does 1 – 100)

67. Plaintiffs refer to paragraphs 1 through 66 and, by this reference, incorporate said paragraphs herein as though set forth in full.

68. At all times mentioned herein, Defendants were the importers, producers, and distributors of chemical products which were delivered to or used at various facilities in Puerto Rico, including at Makita, National Rental and Tool Box, where Plaintiff, Gerardo Campos, was exposed to them.

69. Said chemical products were defective in their design because they failed to perform as safely as an ordinary user would expect when used in an intended and reasonably foreseeable manner, because the risks of using and being exposed to Defendants' products outweighed the benefits of said products, and because safer feasible alternative designs existed which would have made Defendants' products less harmful when used as intended.

70. Safety-Kleen's parts washer machines were defective in their design for at least three reasons:

a.  First, the machines lacked a local exhaust ventilation device to remove toxic vapors form the solvent and prevent workers operating the machine from inhaling them.  Such devices have long been used in industry and a ventilation device could, and should have been designed as a standard part of the machine.  Such a device would have substantially reduced operator exposure to toxic solvent vapor by inhalation, the primary exposure hazard to the solvent.  Of course, a more sophisticated device such as a laminar airflow hood would have totally eliminated respiratory exposure to the solvent.  Such devices have commonly been used in hazardous industrial applications since the early 1980s.

b.  Second, the machines lacked a barrier to prevent solvent from splashing onto machine operators.  The ordinary operation of the machine as intended results in much splashing of the solvent on operators' arms, face, neck and upper torso.  This exposure presents a substantial skin absorption hazard.  A simple plastic barrier slightly above the lip of the sink on the front of the

machine (with space below for the operator to insert his hands to degrease parts) could prevent the splashing of solvent on exposed areas of workes' bodies. Of course, a more sophisticated devices than a plastic barrier, such as a glove box, would have provided even greater dermal protection.

c.   Third, the machines lacked a cyclonic separator or other solvent-purifying device. A cyclonic separator is a device which filters sold particles out of contaminated solvent by means of centrifugal force, trapping the particles in a chamber for removal. The cyclonic separator reduces contamination of the solvent and customer exposure to certain toxins that contaminate the solvent. It also reduces odors and emissions of volatile organic compounds and even extends the useful life of the solvent. The cyclonic separator technology is hardly rocket science an its effectiveness has been proven. Indeed, Safety-Kleen provide the device it to its customers in a similar "green" machine for use with a less toxic solvent.

71. The recycled Safety-Kleen 105 Solvent is defective for at least two reasons:

a.   First, it contains high levels of toxic and carcinogenic chlorinated solvents which do not exist in virgin mineral spirits. Indeed, toxic chlorinated compounds accumulate and concentrate in the solvent as these toxic chemicals are introduced into the solvent stream by automotive customers at a rate greater than they are removed by carry-off and evaporation.

b.   Second, the benzene content of the recycled solvent is substantially greater than the benzene content of virgin mineral spirits, due to introduction of benzene-containing gasoline into the solvent by customers.

72. Said design defects existed in Defendants' products when said products left Defendants' possession.

73. As a direct and proximate result of said design defects, while using said chemical products in a manner that was reasonably foreseeable and intended by Defendants', Plaintiff, Gerardo Campos, was exposed to Defendants' chemical products in the course of his employments with various facilities in Puerto Rico including Makita, National Rental and Tool Box and suffered serious injuries and disease, including chronic myelogenous leukemia and other related medical conditions.

74. Plaintiff, Gerardo Campos,was exposed to each of the foregoing toxic chemical products.

75. Each of the toxic chemical products to which Plaintiff, Gerardo Campos,was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

76. As a result of Plaintiff, Gerardo Campos', exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene, entered Plaintiff, Gerardo Campos', body.

77. Plaintiff, Gerardo Campos, suffers from a specific illness, to wit, chronic myelogenous leukemiaand other injuries.

78. Each of the foregoing toxic chemical products caused Plaintiff, Gerardo Campos', chronic myelogenous leukemia and other injuries, and in causing his death.

79. Each toxin that entered Plaintiff, Gerardo Campos', body was a substantial factor in bringing about, prolonging, and aggravating his chronic myelogenous leukemia and other injuries.

80. As a direct and proximate result of the defective design of Defendant's chemical products, Plaintiff, Gerardo Campos, suffered from chronic myelogenous leukemia and other related consequential medical conditions.

81. As a direct and proximate result of the defective design of Defendants' chemical products, Plaintiffs have suffered losses and damages for medical and related expenses for Decedents medical care, lost earnings, lost wages, loss of future earning capacity, and other than damages for pain, suffering and disfigurement.

82. As a direct and proximate result of the defective design of Defendants' products, Plaintiffs, Yadira D. Veguilla Rosario and Camila A. Campos Veguilla, have suffered loss of financial benefits, services, advice, training, love, comfort, companionship, society, affection, solace, and moral support.

83. As a direct and proximate result of the defective design of Defendants' chemical products, Plaintiff, Yadira D. Veguilla Rosario, has suffered loss and deprivation of the services, love, companionship, comfort, affection, society, solace, and moral support of her husband, and enjoyment of sexual relations with him.

84. In exposing Plaintiff to said toxic chemicals, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiff, Gerardo Campos', safety despite knowledge of the probable dangerous consequences of their chemicals, and willfully and deliberately failed to avoid said dangerous consequences of, or culpably indifferent to, unnecessary risks of injury to Plaintiff, Gerardo Campos, and failed and refused to take steps to eliminate or adequately reduce the risk of said dangerous consequences to Plaintiff.  Defendants concealed known toxic hazards of their chemicals from Plaintiff, Gerardo Campos, specifically by failing to warn Plaintiff of adverse toxic effect of their chemicals, and such hazards were known by and such concealment was ratified by the corporate officers and managers of each of the defendants. Defendants consciously decided to market their chemicals with knowledge of their harmful effects and without remedying the toxic effects of their chemicals, and such marketing despite

knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants.  Defendants also misrepresented the nature of their chemical products, by withholding information from Plaintiff, Gerardo Campos, regarding toxic chemicals released from their products during their anticipated or reasonably foreseeable uses, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the defendants.

85. In the early 1990s, Paul Dittmar, Safety-Kleen's Product and Process Development Manager, was assigned the task of determining the extent of the solvent contamination problem and identifying remedial technologies.  In a memo address to the company's general counsel, Mr. Dittmar concluded that the solvent contamination problem was a major problem.  He determined that a number of different technologies existed to resolve the problem, but that the best and simplest technology was fractional distillation – technology which has been used to refine crude oil and the turn of the century.

86. Mr. Dittmar determined that the use of such technology would totally eliminate benzene from the recycled product and reduce the chlorinated content of the solvent by 90%.  Mr. Dittmar, who is not only a chemist but also holds a Masters Degree in Business Administration, then proceeded to determine the cost of implement fractional distillation technology at Safety-Kleen's domestic recycling centers.  He determined that the cost of installation of the fractional distillation equipment would only be about $1 million for each of the company's half-dozen recycling facilities and that the additional cost of processing the solvent would b about 2 to 4 cents per gallon.

87. Although Safety-Kleen was aware that its recycling process was defective and that it could be easily remedied for a capital expenditure of $1 million for each of its half-dozen

recycling facilities (about ½ of one percent of tis annual gross revenues) and a cost of about 3 cents per gallon (which could easily have been passed on its customers), Safety-Kleen did not install fractional distillation equipment at its recycle centers.

88. Defendants' conduct in exposing Plaintiff to said toxic chemicals without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiffs, entitling Plaintiffs to punitive and exemplary damages.

## IX.   FOURTH CAUSE OF ACTION
FOR FRAUDULENT CONCEALMENT
(By All Plaintiffs Against
All Named Defendants and Does 1 – 100)

89. Plaintiffs refer to paragraphs 1 through 88 and, by this reference, incorporate said paragraphs herein in full.

90. At all times mentioned herein, Defendants were the importers, producers, and distributors of chemical products which were delivered to or used at various facilities in Puerto Rico, including at Makita, National Rental and Tool Box, where Plaintiff, Gerardo Campos, was exposed to them.

91. Defendants' chemical products to which Plaintiff, Gerardo Campos, was exposed are toxic.

92. Defendants were aware of the toxic nature of their products.

93. Defendants were under a legal duty to full disclose the toxic properties of their products directly to Plaintiff, Gerardo Campos.

94. Notwithstanding their knowledge of the toxic properties of their chemical products, at all material times hereto, Defendants concealed said toxic hazards from Plaintiff, Gerardo Campos, so that Plaintiff, Gerardo Campos, would use Defendants' chemical products.

95. Plaintiff, Gerardo Campos, was unaware of the toxic hazards of Defendants' chemicals and would not have acted as he did had he know of said concealed hazards.

96. As a direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their chemical products, Plaintiff, Gerardo Campos, was exposed to Defendants' chemical products in the course of his employments and suffered serious injuries and diseases, including chronic myelogenous leukemia and other related medical conditions.

97. Plaintiff, Gerardo Campos, was exposed to each of the foregoing toxic chemical products.

98. Each of the toxic chemical products to which Plaintiff, Gerardo Campos, was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

99. As a result of Plaintiff, Gerardo Campos', exposure to the foregoing toxic chemical products, toxins within said chemical products, including benzene, entered Plaintiff, Gerardo Campos', body.

100.    Plaintiff, Gerardo Campos, suffered from a specific illness, to wit, chronic myelogenous leukemia, as well as other related and consequential injuries.

101.    Each of the foregoing toxic chemical products caused Plaintiff, Gerardo Campos', chronic myelogenous leukemia and other injuries.

102.    Each toxin that entered Plaintiff, Gerardo Campos' body was a substantial factor in bringing about, prolonging, and aggravating Plaintiff, Gerardo Campos', chronic myelogenous leukemia and other injuries.

103.    As a direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their chemicals, Plaintiff, Gerardo Campos, suffered from chronic myelogenous leukemia and other related and consequential medical conditions.

104.     As a direct and proximate result of Defendant's fraudulent concealment of the toxic hazards of their chemicals, Plaintiffs have suffered losses and damages for medical and related expenses for his medical care, lost earnings, lost wages, loss of future earning capacity, and other than damages for pain, suffering and disfigurement.

105.     As a direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their chemicals, Plaintiffs, Yadira D. Veguilla Rosario and Camila A. Campos Veguilla, have suffered loss of support and other financial benefits, services, advice and training, love, comfort, companionship, society, affection, solace, and moral support.

106.     As a direct and proximate result of Defendant's fraudulent concealment of the toxic hazards of their chemicals, Plaintiff, Yadira D. Veguilla Rosario, has suffered loss and deprivation of the services, love, companionship, comfort, affection, society, solace, and moral support from her husband and enjoyment of sexual relations with him.

107.     In exposing the Plaintiff to said toxic chemicals, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiffs safety despite knowledge of the probable dangerous consequences of their chemicals and willfully and deliberately failed to avoid said dangerous consequences befalling Plaintiff.  Defendants were either aware of, or culpably indifferent to, unnecessary risks of injury to Plaintiff and failed and refused to take steps to eliminate or adequately reduce the risk of said dangerous consequences to Plaintiff. Defendants concealed known toxic hazards of their chemicals from Plaintiff, specifically by failing to warn Plaintiff of adverse toxic effects of their chemicals, and such hazards were known by and such concealment was ratified by the corporate officers and managers of each of the defendants.  Defendants consciously decided to market their chemicals with knowledge of their harmful effects and without remedying the toxic effects of their chemicals, and such marketing

despite knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants. Defendants also misrepresented the nature of their chemical products, by withholding information from Plaintiff regarding toxic chemicals released from their products during their anticipated or reasonably foreseeable uses, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the defendants.

108.     In the early 1990s, Paul Dittmar, Sagety-Kleen's Product and Process Development Manager, was assigned the task of determining the extent of the solvent contamination problem and identifying remedial technologies. In a memo addressed to the company's general counsel, Mr. Dittmar concluded that the solvent contamination problem was a major problem. He determined that a number of different technologies existed to resolve the problem, but that the best and simplest technology was fractional distillation – technology which has been used to refine crude oil since the turn of the century.

109.     Mr. Dittmar determined that the use of such technology would totally eliminate benzene from the recycled product and reduce the chlorinated content of the solvent by 90%. Mr. Dittmar, who was not only a chemist but also holds a Masters Degree in Business Adminstration, then proceeded to determine the cost of implementing fractional distillation technology at Safety-Kleen's domestic recycling centers. He determined that the cost of the installation of the fractional distillation equipment would only be about $1 million for each of the company's half-dozen recycling facilities and that the additional cost of processing the solvent would be about 2 to 4 cents per gallon.

110.     Although Safety-Kleen was aware that its recycling process was defective and that it could be easily remedied for a capital expenditure of $1 million for each of its half-dozen

recycling facilities (about ½ of one percent of its annual gross revenues) and a cost of about 3 cents per gallon (which could easily have been passed on to its customers), Safety-Kleen did not install fractional distillation equipment at its recycle centers.

111.     Defendants' conduct in exposing Plaintiff to said toxic chemicals without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiffs, entitling Plaintiffs to punitive and exemplary damages.

## X.      FIFTH CAUSE OF ACTION
FOR BREACH OF IMPLIED WARRANTIES
(By All Plaintiffs Against
All Named Defendants and Does 1 – 100)

112.     Plaintiffs refer to paragraphs 1 through 111 and, by this reference, incorporate said paragraphs herein as though set forth in full.

113.     At all times mentioned herein, Defendants were the importers, producers, and distributors of chemical products which were purchased by Plaintiff's employer and delivered to or used at various facilities in Puerto Rico, including Makita, National Rental and Tool Box, where Plaintiff, Gerardo Campos, was exposed to them.

114.     Defendants' chemical products to which Plaintiff was exposed are toxic.

115.     By placing their chemical products in the stream of commerce, Defendants impliedly warranted that their chemical products were of merchantable quality, that they were not defective, that they would function as safely as ordinary users would expect when used in an intended or reasonably foreseeable manner, and that they would not cause serious disease, harm, or death.

116.     Defendants, and each of them, breached said implied warranties, because their toxic chemical products were not reasonably fit for their intended uses, were not of merchantable

quality, were defective, and failed to function as safely as an ordinary user would expect when used in an intended or reasonably foreseeable manner, and caused serious injuries to Plaintiff, Gerardo Campos, to wit, chronic myelogenous leukemia and other injuries.

117.    Plaintiff, Gerardo Campos, was exposed to each of the foregoing toxic chemical products.

118.    Each of the toxic chemical products to which Plaintiff, Gerardo Campos, was exposed, was the manufactured and/or supplied by the foregoing defendants, as set forth above.

119.    As a result of Plaintiff, Gerardo Campos', exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene entered Plaintiff, Gerardo Campos' body.

120.    Plaintiff, Gerardo Campos, suffered from a specific illness, to wit, chronic myelogenous leukemia, as well as other related and consequential injuries.

121.    Each of the foregoing toxic chemical products caused Plaintiff, Gerardo Campos' chronic myelogenous leukemia and other injuries.

122.    Each toxin that entered Plaintiff, Gerardo Campos'body was a substantial factor in bringing about, prolonging, and aggravating his chronic myelogenous leukemia and other injuries.

123.    As a direct result and proximate result of Defendants' breaches of implied warranties, Plaintiff, Gerardo Campos, suffered serious injuries and disease, including chronic myelogenous leukemia and other related and consequential medical conditions.

124.    As a direct and proximate result of Defendants' breaches of implied warranties, Plaintiffs have suffered losses and damages for medical and related expenses for Decedent's

medical care, lost earnings, lost wages, loss of future earning capacity, and other than damages for pain, suffering and disfigurement.

125.     As a direct and proximate result of Defendants' breaches of implied warranties, Plaintiffs, Yadira D. Veguilla Rosario and Camila A. Campos Veguilla, have suffered loss of the value of benefits, financial benefits, services, advice and training, love, comfort, companionship, society, affection, solace, and moral support.

126.     As a direct and proximate result of Defendants' breaches of implied warranties, Plaintiff, Yadira D. Veguilla Rosario, has suffered loss and deprivation of the services, love, companionship, comfort, affection, society, solace, and moral support of her husband, and enjoyment of sexual relations with him.

## XI.     SIXTH CAUSE OF ACTION
### NEGLIGENCE
(By all Plaintiffs Against All Employer Defendants)

127.     Plaintiffs refer to paragraphs 1 through 126 and, by this reference, incorporate said paragraphs herein as though set forth in full.

128.     Employer Defendants also failed to adequately warn Plaintiff, Gerardo Campos, of the hazards of said toxic chemical products and failed to provide adequate instructions and/or training to Plaintiff, Gerardo Campos, for the safe handling and use of said toxic chemical products.

129.     Employer Defendants also failed to adequately provide the necessary protection and/or protective gear to Plaintiff, Gerardo Campos, while he was exposed to the said toxic chemical products.

130.     Plaintiff, Gerardo Campos, was exposed to each of the foregoing toxic chemical products.

131.     Each of the toxic chemical products to which Plaintiff, Gerardo Campos was exposed, was at his employment with Employer Defendants.

132.     As a result of Plaintiff, Gerardo Campos exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene, entered Plaintiff, Gerardo Campos', body.

133.     Plaintiff, Gerardo Campos, suffered from a specific illness, to wit, chronic myelogenous leukemia, as well as other related and consequential injuries.

134.     Each of the foregoing toxic chemical products caused Plaintiff, Gerardo Campos', chronic myelogenous leukemia and other injuries.

135.     Each toxin that entered Plaintiff, Gerardo Campos' body was a substantial factor in bringing about, prolonging, and aggravating his chronic myelogenous leukemia and other injuries.

136.     As a direct and proximate result of said negligent acts and omissions of the Employer Defendants, Plaintiffs suffered losses and damages for medical and related expenses for Plaintiff, Gerardo Campos' medical care, lost earnings, lost wages, loss of future earning capacity, and damages for pain, suffering and disfigurement.

137.     As a direct and proximate result of said negligent acts and omissions of said Employer Defendants, Plaintiffs Camila Campos Veguilla and Yadira D. Veguilla Rosario, have suffered loss of financial benefits, services, advice and training, love, comfort, companionship, society, affection, solace, and moral support.

138.     As a direct and proximate result of said negligent acts and omissions of the Employer Defendants, Plaintiff, Yadira D. Veguilla Rosario, has suffered loss and deprivation of

the services, love, companionship, comfort, affection, society, solace, and moral support of her husband, and enjoyment of sexual relations with him, from the time he became incapacitated.

## XII.   REQUEST FOR ATTORNEYS FEES AND COSTS

139.    Plaintiffs request that this Honorable Court award attorneys fees, including litigation expenses, and the costs of this action.

## XIII.   DEMAND FOR TRIAL BY JURY

140.    Plaintiffs demand a trial by jury.

## XIV.   PRAYER FOR RELIEF

141.    WHEREFORE, plaintiffs request that this Honorable Court:

    a.  Find and hold that defendants were negligent in failing to adequately design, manufacture, label, test and inspect their parts washer and Solvent 105 before being sold;

    b.  Award damages in an amount not less than $75,000,000.00;

    c.  Award plaintiffs' attorneys fees, including litigation expenses and the costs of this action; and

    d.  Grant such other relief as may be just and proper.

WHEREFORE, it is respectfully requested from this Honorable Court to consider and grant this Amended Complaint, awarding Plaintiffs a reasonable amount of compensatory damages as well as legal costs and attorneys fees.

Dated:  November 2, 2012

Respectfully submitted


/s/ Lillian E. Menodoza-Toro
**Lillian E. Mendoza-Toro**
New San Juan Cond.
Apt. 701
Isla Verde Ave. 6471
Carolina, PR 00979
Tel/fax 787-772-3589
Cell 787-502-1089
Email: mendozatorolaw@aol.com

and

/s/  Leah Charbonnet
**Leah Charbonnet**
Florida Bar No.  34613
Clark, Robb, Mason,
Coulombe & Buschman, P.A.
7501 Wiles Road
Suite 207
Coral Springs, Florida 33067
Tel:  954-753-3902
Fax:  954-753-3903
E-mail:  lcharbonnet@clarkrobb.com

**PLAINTIFFS' COUNSEL**